Approved: _____
         JUSTIN V. RODRIGUEZ / SHEB SWETT
         Assistant United States Attorneys

Before:  HONORABLE GABRIEL W. GORENSTEIN
         United States Chief Magistrate Judge
         Southern District of New York

- - - - - - - - - - - - - - - - x  Sealed
                                :  **COMPLAINT**
UNITED STATES OF AMERICA        :
                                :  Violation of
       - v. -                   :  21 U.S.C. § 846
                                :
MANOLO DONES, a/k/a "Mo,"       :  COUNTY OF OFFENSE:
PEDRO HERNANDEZ, a/k/a          :  BRONX
"Pedrito,", a/k/a "Cuba,"       :
EDWARD TORRES,                  :  **19 MAG 00118**
a/k/a "Papucho,"                :
ALBERTO PELLOT,                 :
a/k/a "Alex,"                   :
LUIS GARCIA,                    :
JOANNE MARTINEZ,                :
JOANNA MARTINEZ,                :
ANA GARCIA, a/k/a "Annie," and  :
ANGELA BOSQUEZ, a/k/a "Angie,"  :
                                :
              Defendants.       :
                                :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   JOSE REYNA, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD"), and charges as follows:

### COUNT ONE
(Narcotics Conspiracy)

   1. From in or about January 2018 to the present, in the Southern District of New York and elsewhere, MANOLO DONES, a/k/a "Mo," PEDRO HERNANDEZ, a/k/a "Pedrito," a/k/a "Cuba," EDWARD TORRES, a/k/a "Papucho," ALBERTO PELLOT, a/k/a "Alex," LUIS GARCIA, JOANNE MARTINEZ, JOANNA MARTINEZ, ANA GARCIA, a/k/a "Annie," and ANGELA BOSQUEZ, a/k/a "Angie," the defendants, and

others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree, together and with each other, to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that MANOLO DONES, a/k/a "Mo," PEDRO HERNANDEZ, a/k/a "Pedrito," a/k/a "Cuba," EDWARD TORRES, a/k/a "Papucho," ALBERTO PELLOT, a/k/a "Alex," LUIS GARCIA, JOANNE MARTINEZ, JOANNA MARTINEZ, ANA GARCIA, a/k/a "Annie," and ANGELA BOSQUEZ, a/k/a "Angie," the defendants, and others known and unknown, would and did distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substances that MANOLO DONES, a/k/a "Mo," PEDRO HERNANDEZ, a/k/a "Pedrito," a/k/a "Cuba," EDWARD TORRES, a/k/a "Papucho," ALBERTO PELLOT, a/k/a "Alex," LUIS GARCIA, JOANNE MARTINEZ, JOANNA MARTINEZ, ANA GARCIA, a/k/a "Annie," and ANGELA BOSQUEZ, a/k/a "Angie," the defendants, conspired to distribute and possess with intent to distribute were (i) mixtures and substances containing a detectable amount of fentanyl, (ii) mixtures and substances containing a detectable amount of heroin, and (iii) mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4. I am a Detective with the NYPD and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of report and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview

5.  In or about January 2018, the NYPD began investigating narcotics trafficking occurring in the area of Third Avenue and 146th Street in the Bronx, New York. As set forth in greater detail below, the narcotics sales occurred primarily in front of and inside a diner ("Diner-1") located on Third Avenue.

6.  In the course of this investigation, an NYPD undercover officer ("UC-1") has conducted approximately twenty-five controlled purchases of narcotics, many of them inside Diner-1. In particular, and as set forth in greater detail below, UC-1 has purchased personal-use quantities of heroin and fentanyl from MANOLO DONES, a/k/a "Mo," PEDRO HERNANDEZ, a/k/a "Pedrito," a/k/a "Cuba," EDWARD TORRES, a/k/a "Papucho," ALBERTO PELLOT, a/k/a "Alex," LUIS GARCIA, JOANNE MARTINEZ, JOANNA MARTINEZ, ANA GARCIA, a/k/a "Annie," and ANGELA BOSQUEZ, a/k/a "Angie," the defendants, and others. UC-1 has also observed the defendants coordinate with each other and others to conduct narcotics sales inside and outside Diner-1.

7.  Diner-1 is located near a drug treatment facility ("Facility-1"). MANOLO DONES, a/k/a "Mo," PEDRO HERNANDEZ, a/k/a "Pedrito," a/k/a "Cuba," EDWARD TORRES, a/k/a "Papucho," ALBERTO PELLOT, a/k/a "Alex," LUIS GARCIA, JOANNE MARTINEZ, JOANNA MARTINEZ, ANA GARCIA, a/k/a "Annie," and ANGELA BOSQUEZ, a/k/a "Angie," the defendants, and others, appear to be selling primarily to individuals seeking drug treatment from Facility-1. During the course of this investigation, the NYPD has observed a surge in fatal and non-fatal overdoses within the immediate vicinity of Diner-1, some of which appear to be connected to sales occurring at Diner-1. For example:

    a.  On or about September 6, 2018, a non-fatal overdose occurred on Courtland Avenue in the Bronx, less than one-tenth of a mile from Diner-1. On or about October 16, 2018, I spoke with the overdose victim ("Victim-1"), who stated, in sum and substance, that Victim-1 bought a glassine of heroin from a Hispanic male in front of Diner-1 and passed out immediately after injecting the heroin.

    b.  On or about November 10, 2018, a non-fatal overdose occurred in an apartment in a building on Loring Place in the Bronx, approximately three-and-a-half miles from Diner-1. NYPD recovered a glassine with the stamp "Dope Boys" from the scene. After recovering, the victim ("Victim-2") told NYPD officers, in sum and substance, that Victim-2 purchased the narcotics in the vicinity of Diner-1. That same day, I spoke with the individual

3

who reported the overdose ("Individual-1") who stated, in sum and substance, that Individual-1 and Victim-2 purchased the narcotics from someone named "Chulo" at Diner-1.

### Drug Trafficking at Diner-1

8. Based on my participation in this investigation and conversations with others involved in this investigation, including UC-1, I have learned, among other things, the following:

   a. Diner-1 is located at the intersection of Third Avenue and Courtland Avenue in the Bronx, which is a high-volume drug trafficking area. Diner-1 is next door to a bakery ("Bakery-1") and less than two blocks away from Facility-1, which is located on 147th Street.

   b. I and other NYPD officers have observed numerous hand-to-hand narcotics transactions occurring in front of Diner-1 and Bakery-1. In addition, I have reviewed surveillance footage from cameras inside Bakery-1, which shows what appear to be hand-to-hand narcotics transactions occurring inside Bakery-1.

   c. For several months over the course of this investigation, UC-1 has been inside Diner-1 on numerous occasions, and has observed MANOLO DONES, a/k/a "Mo," PEDRO HERNANDEZ, a/k/a "Pedrito," a/k/a "Cuba," EDWARD TORRES, a/k/a "Papucho," ALBERTO PELLOT, a/k/a "Alex," LUIS GARCIA, JOANNE MARTINEZ, JOANNA MARTINEZ, ANA GARCIA, a/k/a "Annie," and ANGELA BOSQUEZ, a/k/a "Angie," the defendants, and others conduct drug sales inside Diner-1. The defendants and others appear to control the inside of Diner-1 and operate it as an open-air drug market.

   d. Various narcotics dealers, including PELLOT, JOANNE MARTINEZ, JOANNA MARTINEZ, ANA GARCIA, and BOSQUEZ, set up at certain tables in Diner-1 on a regular basis. These dealers place narcotics on the table in plain view of anyone in Diner-1, including Diner-1 employees. They also discuss narcotics freely in front of Diner-1 employees. UC-1 has rarely observed anyone ordering food at Diner-1, although UC-1 has observed Diner-1 employees provide coffee and other beverages to drug sellers and purchasers.

   e. UC-1 has been inside Diner-1 as recently as January 2, 2019, and has continued to observe that drug transactions occur openly inside of Diner-1.

4

Individual Narcotics Transactions

9. Based on my participation in this investigation, including my review of video recordings and my conversations with others involved in this investigation, including UC-1, I have learned, among other things, that on at least nineteen occasions between January 17, 2018 and January 2, 2019, at the direction and under the supervision of myself and other NYPD officers, UC-1 made controlled purchases of narcotics from each of the defendants inside or right outside Diner-1.[1] For example, during that time period, the following occurred, in substance and in part:

      a. On or about January 17, 2018, UC-1 visited Diner-1 to purchase narcotics. During the visit, which was audio-and video-recorded, UC-1 encountered an individual ("Individual-2") and told Individual-2 that UC-1 wanted to purchase a bundle (i.e., ten glassines) of heroin. UC-1 then handed Individual-2 $90. PEDRO HERNANDEZ, a/k/a "Pedrito," a/k/a "Cuba," the defendant, who was standing next to Individual-2, reached into his waistband and gave UC-1 what appeared to be ten glassines wrapped in a rubber band. The contents of the glassines, which weighed approximately 0.519 grams in total, subsequently tested positive in an NYPD laboratory for the presence of heroin.

      b. On or about January 18, 2018, UC-1 visited Diner-1 to purchase narcotics. During the visit, which was audio-and video-recorded, UC-1 encountered MANOLO DONES, a/k/a "Mo," the defendant, outside Diner-1, and told DONES that UC-1 wanted to purchase $10 worth of heroin. DONES instructed UC-1 to follow DONES into Diner-1. Once inside Diner-1, DONES and UC-1 went to a back table, where UC-1 gave DONES $10 and DONES gave UC-1 a glassine containing what appeared to be narcotics. The glassine contained the stamp[2] "Bin Laden." The contents of the glassine, which weighed approximately 0.06 grams, subsequently tested positive in an NYPD laboratory for the presence of heroin.

      c. On or about January 20, 2018, UC-1 visited Diner-1 to purchase narcotics. During the visit, which was audio- and video-recorded, UC-1 encountered HERNANDEZ in front of Diner-1, and told HERNANDEZ that UC-1 wanted to purchase heroin with the "Bin Laden" stamp. HERNANDEZ informed UC-1 that the individual selling heroin with the "Bin Laden" stamp just left Diner-1, but

---

[1] UC-1 participated in twenty-five total controlled purchases, some of which did not involve any of the defendants.
[2] Based on my training and experience, I know that a "stamp" is a unique image or word stamped on a glassine that is used by dealers to brand their narcotics.

5

that HERNANDEZ could sell UC-1 heroin with no stamp. UC-1 gave HERNANDEZ $80 and HERNANDEZ gave UC-1 ten glassines containing what appeared to be narcotics. The contents of the glassines, which weighed approximately 0.479 grams in total, subsequently tested positive in an NYPD laboratory for the presence of heroin.

   d. On or about January 27, 2018, UC-1 visited Diner-1 to purchase narcotics. During the visit, which was audio-and video-recorded, UC-1 encountered DONES outside Diner-1, and told DONES that UC-1 wanted to purchase ten glassines of heroin with the "Bin Laden" stamp for $80. DONES informed UC-1 that DONES did not have heroin with the "Bin Laden" stamp, but had heroin with a different stamp ("The Mechanic") that was better. DONES then walked UC-1 over to EDWARD TORRES, a/k/a "Papucho," the defendant, who was outside of Diner-1. UC-1 gave DONES $80, and TORRES gave UC-1 ten glassines containing what appeared to be narcotics stamped "The Mechanic." UC-1 and DONES agreed to meet again for UC-1 to purchase heroin with the "Bin Laden" stamp. The contents of the ten glassines, which weighed approximately 0.491 grams in total, subsequently tested positive in an NYPD laboratory for the presence of heroin and fentanyl.

   e. Later that same day, UC-1 returned to Diner-1 to purchase narcotics. During the visit, which was audio-and video-recorded, UC-1 encountered LUIS GARCIA, the defendant, outside Diner-1, and told GARCIA that UC-1 wanted to purchase ten glassines of heroin for $80. UC-1 then gave GARCIA $80, and GARCIA gave UC-1 ten glassines containing what appeared to be narcotics. The contents of the ten glassines, which weighed approximately 0.519 grams in total, subsequently tested positive in an NYPD laboratory for the presence of heroin.

   f. On or about February 2, 2018, UC-1 visited Diner-1 to purchase narcotics. Prior to arriving at Diner-1, UC-1 called DONES, which call was recorded. DONES informed UC-1 that he only had ten glassines of heroin at that time. UC-1 then met DONES in front of Diner-1, and proceeded to a building near Willis Avenue in the Bronx. DONES then called for ALBERTO PELLOT, a/k/a "Alex," the defendant, to come out of the building. PELLOT came out and handed multiple glassines to DONES. UC-1 then gave $70 to DONES, and DONES gave UC-1 seven glassines containing what appeared to be narcotics stamped "Bin Laden." The contents of the seven glassines, which weighed approximately 0.53 grams in total, subsequently tested positive in an NYPD laboratory for the presence of heroin.

   g. On or about February 14, 2018, UC-1 visited Diner-1 to purchase narcotics. During the visit, which was audio-and video-recorded, UC-1 encountered DONES in front of Diner-1 and

asked DONES to sell UC-1 ten glassines of heroin. DONES informed UC-1 that DONES only had five glassines available, at which point UC-1 gave DONES $50. DONES gave UC-1 five glassines containing what appeared to be narcotics. UC-1 then told DONES that UC-1 wished to purchase another three glassines and gave him $30. DONES escorted UC-1 inside Diner-1, where UC-1 observed PELLOT hand several small objects to DONES. DONES then gave UC-1 three additional glassines containing what appeared to be narcotics. The contents of the five glassines, which weighed approximately 0.173 grams, subsequently tested positive in a NYPD laboratory for the presence of heroin, cocaine, fentanyl, and tramadol. The contents of the three glassines, which weighed approximately 0.202 grams, subsequently tested positive for the presence of heroin.

h. On or about February 17, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, which was audio- and video-recorded, UC-1 entered Diner-1 and spoke with PELLOT about purchasing ten glassines of heroin. PELLOT instructed UC-1 to go with another individual ("Individual-3"), but first asked UC-1 to give him $80, which UC-1 did. UC-1 then exited Diner-1 with Individual-3. Individual-3 went to a nearby vehicle to retrieve the narcotics, but told UC-1 that there were no narcotics in the vehicle. UC-1 then returned to the front of Diner-1, at which point UC-1 informed PELLOT that Individual-3 did not have any narcotics. PELLOT and UC-1 then entered Diner-1 and PELLOT gave UC-1 ten glassines containing what appeared to be narcotics. The contents of the glassines, which weighed approximately 0.476 grams, subsequently tested in an NYPD laboratory for the presence of heroin.

i. On or about February 24, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, which was audio-and video-recorded, UC-1 entered Diner-1 and approached PELLOT to purchase three glassines of heroin. PELLOT then placed numerous glassines of narcotics on the table. UC-1 provided PELLOT with $30 and PELLOT handed UC-1 three glassines containing what appeared to be narcotics stamped "Bin Laden." The contents of the glassines, which weighed approximately 0.21 grams, subsequently tested positive in an NYPD laboratory for the presence of heroin.

j. On or about March 3, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, UC-1 entered Diner-1 and approached PELLOT and another individual ("Individual-4") to purchase four glassines of heroin. PELLOT then instructed Individual-4 to provide the narcotics to UC-1. UC-1 handed Individual-4 $35, and Individual-4 handed UC-1 four glassines containing what appeared to be narcotics and stamped "Street King." The contents of the glassines, which weighed approximately 0.209

7

grams, subsequently tested positive in an NYPD laboratory for the presence of heroin.

  k. On or about March 10, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, which was audio- and video-recorded, UC-1 entered Diner-1 and approached PELLOT and another individual ("Individual-5") to purchase four glassines of heroin. Individual-5 told UC-1 to give Individual-5 $35, which UC-1 did. PELLOT then handed UC-1 four glassines containing what appeared to be narcotics. PELLOT warned UC-1 to be careful with these drugs because of their potency. The contents of the glassines, which weighed approximately 0.189 grams, subsequently tested positive in a NYPD laboratory for the presence of heroin.

  l. On or about March 22, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, which was audio- and video-recorded, UC-1 encountered LUIS GARCIA outside Diner-1, and told GARCIA that UC-1 wanted to purchase four glassines of heroin for $35. UC-1 then gave GARCIA $35, and GARCIA gave UC-1 four unstamped glassines containing what appeared to be narcotics. UC-1 then entered Diner-1 and approached PELLOT to purchase four glassines of heroin. PELLOT placed numerous bags of narcotics on the table, and after UC-1 provided PELLOT with $40, PELLOT handed UC-1 four glassines containing what appeared to be narcotics stamped "Street King." The contents of the four unstamped glassines, which weighed approximately 0.225 grams in total, subsequently tested positive in an NYPD laboratory for the presence of heroin. The contents of the four "Street King glassines, which weighed approximately 0.21 grams in total, subsequently tested positive in an NYPD laboratory for the presence of heroin.

  m. On or about March 31, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, which was audio- and video-recorded, UC-1 entered Diner-1 and approached JOANNE MARTINEZ, the defendant, who was sitting next to JOANNA MARTINEZ, the defendant, to purchase three glassines of heroin for $25. JOANNE MARTINEZ replied that they would only sell the narcotics for $30 because they only recently began selling at Diner-1 and could not offer a discount. UC-1 then handed $30 to JOANNA MARTINEZ, and JOANNE MARTINEZ then handed UC-1 three glassines containing what appeared to be narcotics and stamped "1Love." The contents of the three glassines, which weighed approximately 0.154 grams in total, subsequently tested positive in a NYPD laboratory for the presence of heroin.

  n. On or about April 11, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, UC-1 entered Diner-1 and approached JOANNE MARTINEZ, who was sitting next to JOANNA

8

MARTINEZ, to purchase seven glassines of heroin for $60. JOANNE MARTINEZ replied that they would not sell that amount, and UC-1 then offered to purchase four glassines of heroin. UC-1 then handed $30 to JOANNE MARTINEZ, which she immediately handed to JOANNA MARTINEZ. JOANNE MARTINEZ then handed UC-1 four glassines containing what appeared to be narcotics and stamped "1Love." The contents of the four glassines, which weighed approximately 0.20 grams in total, subsequently tested positive in a NYPD laboratory for the presence of heroin.

  o. On or about April 28, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, which was audio- and video-recorded, UC-1 entered Diner-1 and approached ANGELA BOSQUEZ, a/k/a "Angie," the defendant, to purchase three glassines of heroin. ANA GARCIA, a/k/a "Annie," the defendant, then approached UC-1, at which point UC-1 repeated that UC-1 wanted to purchase three glassines of heroin. GARCIA then instructed BOSQUEZ to give UC-1 the glassines, at which point BOSQUEZ handed UC-1 three glassines containing what appeared to be narcotics and stamped "Hello !" UC-1 then handed GARCIA thirty dollars. The contents of the three glassines, which weighed approximately 0.146 grams in total, subsequently tested positive in an NYPD laboratory for the presence of fentanyl, heroin, and tramadol.

  p. On or about May 5, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, which was audio- and video-recorded, UC-1 entered Diner-1 and approached ANA GARCIA to purchase three glassines of heroin. GARCIA, who was seated next to another individual ("Individual-6"), instructed Individual-6 to give GARCIA one glassine of heroin. UC-1 then gave GARCIA $40, and GARCIA took out a plastic bag with two glassines containing what appeared to be narcotics and stamped "Hello !" GARCIA added the glassine from Individual-6 to the bag and handed it to UC-1. The contents of the three glassines, which weighed approximately 0.200 grams in total, subsequently tested positive in a NYPD laboratory for the presence of fentanyl, heroin, and tramadol.

  q. On or about May 11, 2018, UC-1 went to Diner-1 to purchase narcotics. During the visit, which was audio- and video-recorded, UC-1 entered Diner-1 and approached ANA GARCIA to purchase ten glassines of heroin with the "Hello !" stamp. UC-1 then gave GARCIA $90, and GARCIA handed UC-1 ten glassines containing what appeared to be narcotics and stamped "Hello !" The contents of the ten glassines, which weighed approximately 0.436 grams in total, subsequently tested positive in a NYPD laboratory for the presence of heroin and tramadol.

r. On or about January 2, 2019, UC-1 went to Diner-1 to purchase narcotics. During the visit, which was audio- and video-recorded, UC-1 entered Diner-1 and approached ANA GARCIA to purchase two glassines of heroin. UC-1 then gave GARCIA $20, and GARCIA handed UC-1 two glassines containing what appeared to be narcotics. I have inspected the glassines, and, based on my training and experience and participation in this investigation, I believe that the glassines contain heroin.

### Arrests at Diner-1

10. On or about May 29, 2018, DONES was arrested in the vicinity of Diner-1. On or about the same date, DONES was charged with Criminal Possession of a Controlled Substance in the Third Degree, in violation of New York Penal Law Section 220.16(1), among other offenses. This case is pending. DONES was incarcerated after his arrest, during which time DONES made numerous phone calls, which were recorded by the New York City Department of Corrections. Based on my review of those phone calls, I have learned, among other things the following:

a. On or about June 3, 2018, DONES made a phone call to an unidentified female ("UF"), in which he stated the following, with respect to money that had been placed in his prison account:

UF: Had to be either Pedrito or Lou. Or maybe Lou probably called Pedrito and made him to it.

DONES: Yeah, made him do it, but if that was the case the motherfucker should have went and got 2500 and bailed me the fuck out like he said he was. Fucking faggot I'm here because of him. Him and his fucking [unintelligible] but that's alright though, I swear, yo, if they let me go tomorrow, I'm telling you, watch me twist his fucking worker upside down, I'm taking whatever his worker got, I swear to everything, I'm taking whatever his fucking worker got.

b. On or about June 4, 2018, DONES made a phone call in which he stated the following:

All the money that they caught on everybody - they put all that money on me. They put $980 on me. They put Cuba's five bundles of dope and three bundles of coke on me.
\*\*\*

I'm trying to see if I can fucking someway somehow get in touch with this fucking faggot Cuba and tell this guy] yo my [guy] my bail is $2500 why the fuck am I still here bro? You know what I'm saying you got all this fucking money laying up in the house just doing nothing why am I still here for $2500 yo? Because if I gotta take this case for you when I come home it's gonna be worse cause I'm telling you I'll get on my fucking bullshit with y'all motherfuckers and I'll start robbing your fucking workers and doing all types of crazy shit to you.

    c.    Based on my training and experience and my involvement in this investigation, including my observation of DONES and HERNANDEZ at Diner-1, I believe that DONES is discussing the fact that DONES was being held responsible for narcotics that belonged to HERNANDEZ ("Pedrito" or "Cuba"), and that if HERNANDEZ did not pay DONES's bail or otherwise assist him with his criminal case, DONES would rob HERNANDEZ's other workers at Diner-1 once he was released from prison.

    11.    On or about September 13, 2018, DONES and TORRES were arrested inside Diner-1 for possession of heroin and cocaine. DONES and TORRES were charged with Criminal Sale of a Controlled Substance in the Third Degree, in violation of New York Penal Law Section 220.39(1), among other offenses. These cases are pending.

WHEREFORE, the deponent respectfully requests that MANOLO DONES, a/k/a "Mo," PEDRO HERNANDEZ, a/k/a "Pedrito," a/k/a "Cuba," EDWARD TORRES, a/k/a "Papucho," ALBERTO PELLOT, a/k/a "Alex," LUIS GARCIA, JOANNE MARTINEZ, JOANNA MARTINEZ, ANA GARCIA, a/k/a "Annie," and ANGELA BOSQUEZ, a/k/a "Angie," the defendants, be imprisoned or bailed as the case may be.

_____
JOSE REYNA
Detective
New York City Police Department

Sworn to before me this
4th day of January, 2018.

_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES CHIEF MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK